[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION
The plaintiffs brought this action in several counts CT Page 2331 against three defendants: Housemaster of America, a New Jersey corporation in the business of franchising a house inspection service; Margaret Rodell, president of Dubl M Enterprises; and Dubl M Enterprises, Inc., a Connecticut corporation and the franchisee doing business as "Housemaster of America" in the Danbury area. Although the defendants Housemaster of America and Margaret Rodell had filed a special defense distinguishing themselves from Dubl M Enterprises, Inc. insofar as any relationship with and any possible liability to the plaintiffs might be concerned, during the course of the trial, these defendants withdrew that defense and agreed to be considered with Dubl M Enterprises as a commonality. The court will therefore use the term "defendants" to signify the three defendants in common.
The plaintiffs claim and the court finds that the evidence supports such claims that, on April 22, 1988, they entered into an agreement (Plaintiff's Exhibit A) to purchase from Homequity, Inc., for a price of $370,000, property located at 310 Hurlbutt Street in Wilton, on April 22, 1988. The purchase agreement provided that "The purchaser agrees that he has examined the premises and is fully satisfied with the physical condition thereof [subject to certain conditions set forth in an attached Schedule C] . . . and agrees to accept premises in "as in" condition." After the execution of an earlier binder and before signing the purchase contract, the plaintiffs engaged the defendants to conduct an house inspection on March 23, 1988. The inspection was conducted by an employee of the defendants, Clark Denslow. The plaintiff, Frank Blumm, accompanied the inspector as he made a visual inspection of the premises. A written report of the inspection (Plaintiffs' Exhibit B) was prepared by Clark Denslow and forwarded to the Blumms at the end on March.
The report noted a number of problems and defects. Specifically, the report indicated as to the matters which formed the basis of the plaintiffs' complaint:
that the roof was in poor condition and the cost of replacement would be about $3,500.00 to $4000.00;
that both chimneys servicing the house were in overall CT Page 2332 satisfactory structural condition, except that the flashing had lifted and mortar/brick damage was noted at the chimney tops;
that settlement cracks were observed in the house foundation but were within normal tolerance;
that the overall property grading is fair, but the property slopes toward the house at front;
that while overall grading at the foundation was adequate, maintaining a slope away from the foundation would help drain water away;
that while the basement exhibited no seepage at the time of inspection, water marks and efflorescence on walls and floor indicated prior water penetration. It was impossible to determine the extent or probability of future water penetration and the client should resolve any doubts before closing; that the attached two car garage was in overall operable structural condition but the garage floor had cracks and moderate settlement was noted at the house interface and a negative slope in the garage might cause water ponding, run-off and accumulation; and,
that the driveway slopes towards the garage and house, suggesting the desirability of adding a drain in front of the doors to minimize run-off and water penetration.
The report did not note that the foundation wall of the garage had pulled away from the house to the point where daylight could be seen in the void. The report did not indicate that the south chimney had a two inch lean at the top away from the house. Aside from the roof, the report did not indicate any major structural problems and specifically did not indicate any major structural problems with the south chimney or with the garage foundation.
After receiving the report, the Blumms executed the contract to purchase paying down $37,000.00.
In conjunction with that purchase, the plaintiffs contracted to and did sell their home in New York State to acquire some of the purchase price.
A provision of Schedule C of the purchase contract was that the Blumms would be credited to the sum of $5,000.00 for roof and chimney repairs. To that end, the Blumm's sought to engage a contractor, Hank Urban, to do the roof repair. When Mr. Urban visually examined the roof and the rest of the premises, he indicated that there were problems of such a serious nature that CT Page 2333 they should be repaired and he refused to do the work unless he could attend the defects, involving at that time the south chimney and the garage foundation, as well as the roof.
Specifically, he noted the rear wall of the garage had pulled away from the house sill to approximately two and one-half inches. He also noted that the south chimney had moved out from the house at least two inches and believed the condition would get worse creating a substantial possibility of collapse. Since he did not feel he could do the work and warranty a satisfactory result, he refused to take on the job.
The closing was scheduled for May 27, 1988. The plaintiffs requested a reinspection by the defendant's agent, Clark Denslow, with attention to the problems indicated by Mr. Urban. The defendants, on May 25, 1988, conducted the reinspection and submitted, on that date, an addendum to the report (Plaintiff's Exhibit C), noting a gap at the room chimney/siding joint and recommending sealing the gap and monitoring for future movement. The addendum also noted that there was active leakage in the basement with water on the basement floor.
The plaintiffs also arranged for an inspection by a professional engineer who specialized in building inspections, Mr. Murray Brenner. He conducted a visual inspection and submitted his report (Plaintiff's Exhibit D) on May 25, 1988. His report indicated that the garage floor and foundation had sunk, due either to water erosion or using uncompacted soil during construction and that repairs would be necessary to ensure structural integrity. He also indicated that the chimney had moved since it was built due either to soil compression or water erosion. He did not recommend repair because of the weight of the chimney. He recommended that these items should be monitored over time to see if there might be any further movement. He indicated that any continuing movement of the chimney would require expensive repairs.
At a later point, Mr. Urban did test digging at the garage and south chimney. In general, he found a lack of mortar fill in the foundation blocks and no foundation footing at all and no drain tiles installed. A severe water drainage problem was aggravating the lack of adequate foundation construction. He indicated the condition of the garage floor and the lean of the chimney were major structural defects. He estimated the cost to correct the defects would be approximately $42,000.00.
Based on the information supplied by Messrs. Brenner and Urban, the plaintiffs concluded that there were major structural problems with the house which they could not afford to repair they declined to close but instead, attempted to renegotiate the CT Page 2334 purchase price with Homequity, to account for the cost of repair of the defects. After extensive negotiations with the seller, the plaintiffs settled with seller in September, 1988 receiving back $30,500.00 of their downpayment of $37,000.00 with the seller retaining $6,500.00 (Plaintiff's Exhibit F).
The plaintiffs claim and the court credits their claim that they signed the contract to purchase the property only after they had secured the inspection report on the house from the defendants. The report issued by the defendants in March, 1988, gave no indication other than that the building and attached garage were in overall satisfactory structural condition and did not alert the plaintiffs to the structural defects noted by Mr. Urban and Mr. Brenner. The plaintiffs, relying on that report, entered into the purchase agreement with no reservation of a building inspection contingency.
The plaintiffs claim and the court finds that if they had been notified of the defects, they would not have entered into the contract they signed.
The plaintiffs did purchase an house in Weston, Connecticut, in February, 1989.
In this action against these defendants, the plaintiffs claim as consequential damages the following monies lost or expended unnecessarily to acquire the house:
Loss of a portion of the downpayment ($6,500.00) and the interest on that portion;
b. The fee paid to the defendant for the home inspection in the amount $435;
c. Additional engineer reports costing $1,200;
d. Westport commuter's annual parking permit fee of $100;
e. Moving expenses from plaintiffs' home to a storage facility of $810;
f. Mortgage application fee of $250;
g. Storage fees of $2,877.50 for storing household goods and furniture from the original date of closing on the subject property until the closing on the house ultimately purchased;
h. Rental of temporary living quarters from the original date of closing on the subject property until the closing on the house ultimately purchased of $6,300; CT Page 2335
i. Loss of interest on the $37,000 downpayment at 6% per month from the date the downpayment was made to the return date of the downpayment, calculated to be $1,110;
j. Loss because of the increase of the mortgage interest rate from 10% on the mortgage commitment secured for the purchase of the subject property to 10.625% on the mortgage loan for their new home calculated, over a period of 30 years, to amount to $28,141.20;
k. Cost of additional well testing amounting to $105;
l. Miscellaneous expenses for travel, toll calls, extraordinary postage claimed to be $400; and
m. Attorney fees to recover lost monies of $2,175.
The defendants have attacked the plaintiffs' complaint as failing to state any comprehensible action in breach of contract or negligence. While the pleading is not a paragon of clarity, it may fairly be read to sound in contract and negligence. The defendants' filed no pretrial motions addressed to their claim that the action sounded in some sort of fraudulent misrepresentation.
The defendants then point out that there was an inspection order agreement (Defendants' Exhibit 1), signed by the plaintiff Frank Blumm, which indicates that "[s]ince a home inspection is not intended to be an insurance policy against undisclosed or future defects, the Company's liability for any Client post-inspection claims is limited to a maximum of the inspection fee paid unless an inspection warranty is available and has been purchased by the client."
The defendants also point out that at the bottom of the report supplied to the plaintiffs is printed (in small print), "While every reasonable effort was made to ascertain the present condition of the inspected house proper, HMA does not, under any circumstances, make any representation as to the reported condition or the house's future condition. This inspection was performed under the terms and conditions of the HMA Inspection Order Agreement."
While these provisions seem inconsistent with the defendants' claim that no contract existed, the defendants cite these provisions as limitations on any liability.
The court finds from the testimony and evidence presented, that the Inspection Order Agreement was signed by Frank Blumm on CT Page 2336 the day and at the site of the inspection by Mr. Denslow; that the terms were neither reviewed with him by the defendants' agent nor explained to him by the defendants' agent; and he was not supplied with a copy of the order at that time. The court further finds that no copy of the Inspection Order Agreement was sent to the plaintiffs by the defendants in conjunction with the mailing of the Inspection Report as claimed by the defendants.
Under these circumstances, any claimed limitation of liability insofar as it attempts to exempt the defendants from their negligence is a nullity. Fedor v. Mauwehu Council,21 Conn. Sup. 38 (1958). This is especially so, since in the paragraph of the Order Agreement which contains the exemption, the defendants acknowledge at least some responsibility for "conditions which could be ascertained through limited inspection and observation at the time of the inspection." (Defendants' Exhibit 1, Paragraph 4). Both Mr. Urban and Mr. Brenner ascertained the serious structural problems by visual observation.
The defendants represented that they comprised an organization that specialized in rendering "an opinion of the condition of the major structural, mechanical and electrical elements of the property on the date of inspection." (Plaintiffs' Exhibit B, Page 1). For this service, a fee of $435.00 was charged. The defendants represented that they would conduct the inspection according to the standards set by the American Society of Home Inspectors (ASHI).
The defendants' inspector failed to identify substantial structural defects in the garage and in the chimney, and also described the grade at the foundation as adequate. The plaintiffs presented an experienced engineer and building inspector and an experienced builder who was also an engineer who indicated that it was visually apparent that these areas presented substantial structural defects and possible failure or collapse which would be expensive to correct or repair. The only conclusion which the court can reach is that the defendants' inspector was negligent in failing to identify these problems.
The defendants' inspector testified that he had not identified the "gap" between the chimney and the house on his first inspection because the chimney was covered with vines and brush which were removed before the second inspection. The plaintiffs testified there was no such obstruction, especially since the inspector made his observations of the chimney from the roof of the house. The court accepts that the "gap" should have been identified on the first inspection and notes that in other portions of the report where vegetation obstructed CT Page 2337 observation, the obstruction was specifically cited. See, Plaintiffs' Exhibit B, Siding: ". . . Siding unobservable due to ivy in several areas."
The defendants also testified that terms such as "operable," "fair," and "satisfactory" had meanings which would indicate that certain expenses would have to be incurred to bring the condition up to standard. For example, to describe a condition as "fair" would mean that substantial expense would be necessary to repair the condition. The defendants' inspector, Clark Denslow, explained that these words were defined in a terminology sheet and these terms should have alerted the plaintiffs to possible substantial expenses in conjunction with the garage and other elements. However, the plaintiffs testified and the court finds that no such sheet was supplied to them with the report and the defendants did not produce any such terminology sheet in evidence.
The defendants assert that to establish liability for claimed negligence, the plaintiffs would have to meet the criteria or establishing professional negligence: the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent member of the profession with the result of injury, loss or damage to the recipient of those services, citing David v. Margolis,215 Conn. 408, 415 (1990). The defendants claim that expert testimony is needed as to both the breach of a duty and also as to a causal connection between the breach and the resulting harm, citing Perez v. Mt. Sinai Hospital, 7 Conn. App. 524,520-21 (1986).
Those are standards applicable to malpractice actions against licensed professionals such as medical doctors or attorneys. Mrs. Rodell testified she had a nursing degree and no background in house inspections, that she was a salesperson who hired others. The specific inspector, Clark Denslow, had no previous education or experience as a house inspector when he was hired. He was given a one-week training program and some field experience by the franchiser. He was not a member of the American Society of Housing Inspectors. Moreover, the plaintiffs did present the testimony of an experienced housing inspector, Mr. Brenner, that the defects were visually apparent. The standard the defendants should have met was that of a reasonably prudent person in the business of housing inspection identifying what the defendants held themselves out as capable of identifying and reporting on: "[c]onditions which could be ascertained through limited inspection and observation at the time of the inspection." CT Page 2338
Damages resulting from a party's negligence, however, are limited to that which should be reasonably foreseeable. In this case, the defendants should have realized that the plaintiffs would rely on the accuracy of the inspection in determining whether or not to enter into a purchase contract. The defendants should have foreseen that, if the plaintiffs were obliged to close on the property, they would look to the defendants for the cost of repair of discovered structural defects, estimated to be $42,000.00. On the other hand, the defendants should have foreseen that, if the plaintiffs were unable or unwilling to close on the contract because of the discovery of substantial structural defects which the defendants had failed to identify, the plaintiffs would most probably stand to forfeit their down-payment.
The plaintiffs attempted to mitigate their damage by trying to renegotiate the sales contract to reflect the cost or a portion of the cost of repairing the discovered defects. In conjunction with that effort, the plaintiffs did expend money for engineering reports in the amount of $1,200.00 to establish the existence of the structural defects. The plaintiffs did save a portion of their downpayment, for whatever the reason of settlement with the sellers, and to that extent mitigated their damages. Under these circumstances, the plaintiffs should not be penalized for electing to terminate the contract.
The court is of the opinion, that the plaintiffs are entitled to be made whole for the portion of their downpayment retained by the sellers, $6,500.00. The plaintiffs are entitled to recover the $435.00 inspection fee since they received nothing of value to them in return. The plaintiffs are entitled to recover the money expended for engineers reports in the amount of $1,200.00.
The court cannot accept the contention that the other expenses incurred by the plaintiffs were foreseeable consequences of the defendants' negligence merely because they temporally followed the defendants' breach of duty. These are expenses that may well have been incurred even if the defendants had alerted the plaintiffs to the defects and the plaintiffs had elected not to sign the sales contract. There was no clear evidence that the plaintiffs sale of their New York residence was contingent on their closing title to the subject property or ; that they would have purchased another home in Connecticut any sooner had they not executed the sales contract in this case.
Although the plaintiffs have pleaded a CUTPA violation there was no evidence to sustain the same — not every breach of contract or negligent act is an unfair trade practice. CT Page 2339
The court therefore finds for the plaintiffs to recover from the defendants the sum of $6,500.00 together with interest at the legal rate from May 28, 1988, together with the sum of $1,200.00 and the sum of $435.00.
NIGRO, JUDGE